IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Laura Acosta, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 4:15-495-RBH-KDW |
| | ) | |
| v. | ) | REPORT and RECOMMENDATION |
| | ) | |
| Hilton Grand Vacations Company, LLC; | ) | |
| and Mark Lamonica, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)

(D.S.C.) for a Report and Recommendation ("Report") on the Motion for Summary Judgment filed by

Defendant Hilton Grand Vacations Company, LLC ("Defendant" or "HGV"), ECF No. 59, in which

HGV seeks judgment as a matter of law as to all remaining causes of action raised against it.[1] When

filed, Plaintiff Laura Acosta ("Plaintiff" or "Acosta") brought the following causes of action against

HGV, her former employer: claims of hostile work environment; sexual harassment/sex

discrimination, and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. §§ 2000e, *et seq.*; discrimination based on age and disability pursuant to the Age

Discrimination in Employment and Americans with Disabilities Acts ("ADEA" and "ADA"

respectively); violation of the South Carolina Wages Act, S.C. Code Ann. § 41-10-10, *et seq.*

("SCWA"); and claims for breach of contract, violation of Plaintiff's rights to privacy, and defamation,

Compl., ECF No. 1-1. Previously, the court dismissed Plaintiff's cause of action for breach of an

implied covenant of good faith and fair dealing; dismissed Plaintiff's cause of action for violation of

---

[1] Other corporate defendants were dismissed by prior Order. *See* ECF No. 89. Defendant Mark Lamonica, also referenced in the record as Mark Lamonaca, remains a named defendant; however, it does not appear that he has been served with process. The Complaint also references "Kevin Kaylor," *see* Compl. ¶¶ 191–97, (also referenced in the record as Kevin Kahler); however, Kaylor/Kahler is not named as a defendant and the record does not include any information regarding service on him. It is recommended Lamonica/Lamonaca and Kaylor/Kahler be dismissed for failure to prosecute. Fed. R. Civ. P. 41.

common law privacy rights to the extent it alleged HIPAA[2] violations; and partially dismissed Plaintiff's cause of action for breach of contract—permitting the breach of contract causes of action to go forward only as to "Defendants' failure to follow its progressive discipline policy before terminating Plaintiff." Order 12, ECF No. 39.

In her response to the pending Motion, ECF No. 71, Plaintiff has withdrawn her causes of action based on the ADEA and the SCWA, as well as her state-law claims of invasion of privacy and defamation. *See* Pl. Mem. 22 (ADEA), 34 (SCWA, privacy, defamation). The following claims remain for consideration herein: a) first cause of action, Title VII hostile work environment; b) second cause of action, Title VII sexual harassment/sex discrimination; c) third cause of action, Title VII retaliation; d) fifth cause of action, ADA disability discrimination; and e) sixth cause of action, breach of an employment contract. *See* Compl.[3] Having considered Defendant's Motion, Plaintiff's response, and Defendant's Reply, ECF No. 72, the undersigned recommends Defendant HGV's Motion for Summary Judgment, ECF No. 59, be *granted*. It is further recommended that any claim remaining against Lamonaca and Kahler[4] be dismissed with prejudice for failure to prosecute and this matter be ended as to all claims and all parties.

I.    Relevant Facts[5]

   A. Plaintiff's hiring

After being interviewed by Mark Lamonaca, HGV's former Senior Director of Sales and Marketing at the Anderson Ocean Club in Myrtle Beach, South Carolina, HGV hired Plaintiff on

---

[2] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified primarily in Titles 18, 26 and 42 of the United States Code).

[3] The Complaint also contains a cause of action for intentional infliction of emotional distress, brought only against unserved individual defendants.

[4] Documents provided by Defendant HGV indicate "Lamonaca" and "Kahler" are the correct spellings of the individuals identified in the Complaint as "Lamonica" and "Kaylor."

[5] To the extent supported by the record and germane to this Motion, the court considers the facts in the light most favorable to Plaintiff, the nonmoving party, and potentially differing accounts of events are noted. Here, some of the background facts are derived from Defendant's Motion and were not addressed by Plaintiff. Further, some of the information Plaintiff included in her Statement of Facts is better addressed in the context of her arguments below.

February 27, 2012 as a Sales Executive at Anderson Ocean Club. *See* Pl. Dep. 66–67, ECF No. 59-6; Feb. 27, 2012 Ltr., ECF No. 59-5. Sales executives' duties and responsibilities include "selling HGV timeshare product to potential customers and provide them with [] outstanding customer service." Dep. of HGV Anderson Ocean Club Human Resources ("HR") Manager, Lauren Hlavaty 25–26, ECF No. 71-11. On a day-to-day basis, sales executives meet with guests and take them on a tour/sales presentation, where they are to "explain the product and sell the product" and "insure that each guest as a guest of Hilton leaves with a positive experience." *Id.* at 26. Lamonaca was supervisor for her "entire employment." Hlavaty Aff. ¶ 4, ECF No. 61-1. Plaintiff testified that Lamonaca was at a level of supervision above Kevin Kahler (Senior Sales Manager at Anderson Ocean Club and Plaintiff's immediate supervisor for part of time of employment). *See* Pl. Dep. 98.

Plaintiff understood that she could be terminated without prior warning for engaging in a confrontation with a guest or violating HGV's Standards of Conduct policy. Pl. Dep. 89, 93–94. In paperwork she completed on February 7, 2012, just prior to being hired, Plaintiff self-identified as belonging to the "White (Not Hispanic or Latino)" ethnic group. Equal Employment Opportunity Data, ECF No. 59-8. At that same time, Plaintiff indicated she was not a disabled individual. *Id.* Plaintiff testified that she was aware she had high blood pressure at the time she went to work for HGV. Pl. Dep. 69–70. Plaintiff later learned she had diabetes at the time she was hired by HGV. She testified that neither her diabetes nor her high blood pressure affected her ability to perform her job duties. *Id.*

B. Plaintiff's alleged workplace misconduct and performance issues

On April 24, 2012, Plaintiff was counseled by Kevin Kahler (Senior Sales Manager at Anderson Ocean Club and Plaintiff's then-immediate supervisor) for initialing a timeshare sales contract on behalf of a customer without authorization, in violation of HGV's policies. April 24, 2012 Document of Counseling Session, ECF No. 59-9; Hlavaty Dep. 36–37. Plaintiff acknowledged in deposition that she could have been terminated for this offense even though she had not been disciplined previously. Pl. Dep. 117–19.

The record includes documentation of Kahler's counseling Plaintiff on multiple occasions for failing to meet HGV's sales and referral quotas. *See* Documents of Counseling Session signed by Plaintiff and Kahler on May 6, 2012, June 7, 2012, July 1, 2012 (2), Oct. 2, 2012, ECF No. 59-11. These documents are signed by both Plaintiff and Kahler. *Id.* Plaintiff testified it was Kahler's job to have a monthly evaluation with Plaintiff and discuss performance, numbers, and what she was doing well and in which areas she could improve. Pl. Dep. 102–03.

On February 3, 2013, Sales Manager Kevin Fell indicates he witnessed Plaintiff provide a pill to a customer during a tour on HGV's sales floor. Email from Fell to Lamonaca, ECF No. 59-12.[6] Fell stated Plaintiff summoned him to her table to assist her with two customers (Arthur and Martha Beard) who were unhappy with the manner in which HGV handled their reservation at the Anderson Ocean Club. *Id.* According to Fell, Mrs. Beard "grew animated" as she detailed the problems they experienced, and Plaintiff told Mrs. Beard to relax and offered to "give [her] a chill pill if [she] want[ed] one." *Id.* Shortly thereafter, Fell stated that Plaintiff reached into her bag, extended her hand to Mrs. Beard and said, "Here, this is a baby Xanax." *Id.* Fell did not actually see the pill, but he observed Mrs. Beard take something from Plaintiff's hand, insert it into her mouth, then take a drink of water. *Id.* According to Fell, the Beards returned to the sales floor the following day (February 4, 2013), and Plaintiff asked whether they had gone shopping the previous night. Fell follow-up email to Lamonaca (May 7, 2013), ECF No. 59-13. As relayed by Fell, Mrs. Beard responded, "'I didn't get to do anything. That pill you [Plaintiff] gave me really knocked me out! I fell asleep at about 6:00 p.m.'" *Id.*; *see* Fell Dep. 15, ECF No. 59-14.

_____

[6] Plaintiff disputes Fell's recollection of events. In deposition, Plaintiff acknowledged that she had told the South Carolina Department of Employment and Workforce (SCDEW) following her termination that she had been terminated for giving a customer an aspirin during a tour. Pl. Dep. 165–66; *see* SCDEW Interview Form, ECF No. 61. In deposition Plaintiff testified she had provided a mint to the customer (Mrs. Beard). Pl. Dep. 165. *Cf.* Hlavaty notes of May 11, 2013 telephone conference, ECF No. 60-7 (indicating Plaintiff said she gave Mrs. Beard a "pill. Something else less than a Xanax.").

Fell also testified that on multiple occasions he had witnessed Plaintiff being rude or "argumentative" with customers, sometimes causing customers to leave the sales tours early. *See* Fell Dep. 15–17, 21. Fell also observed Plaintiff "badgering" customers on multiple occasions. *Id.* at 13. Kahler recalled Plaintiff as a "horrible employee" who was "mean to [Hilton's] guests." Kahler Dep. 6, ECF No. 59-15. Kahler described Plaintiff as "pushy" and "[not] real nice to the guests when they came in if things didn't go her way." *Id.* Kahler testified he received complaints from other employees about Plaintiff, although he could not recall the names of those employees. *Id.* at 7.[7]

C. Plaintiff's allegations regarding Kahler

Plaintiff testified that Kahler treated her in a "degrading" manner by, for instance, calling Plaintiff his "token Yankee," talking to her in a disrespectful manner, and telling her to "just shut up." Pl. Dep. 99–100, 103. Plaintiff testified that on one occasion Kahler asked her whether she celebrated Cinco de Mayo. *Id.* at 100. Plaintiff stated that, when Kahler knew Plaintiff was planning to have breast-reduction surgery, he was meeting with her for her "review or something like that," and he said, "So, you going to get those titties reduced, huh?" He continued, "I don't know why you would. You look good with them." *Id.* at 224–25 (quotation marks indicate Plaintiff's words from her deposition as attributed to Kahler). Plaintiff does not remember whether she reported these comments to Hlavaty. *Id.* at 224–26. Hlavaty testified that she did not recall receiving any complaints from Plaintiff regarding Kahler. Hlavaty Dep. 40.

According to Plaintiff, Kahler was "an equal opportunity jerk, both male and female" and was rude and "degrading" to male and female employees on an equal basis. Pl. Dep. 113. Hlavaty testified she received complaints from male and female employees regarding Kahler's "dismissive, condescending" management style. Hlavaty Dep. 41, 66.

---

[7] The record does not contain documentation showing Plaintiff was counseled for such behavior prior to May 2013.

Plaintiff testified that at some point during her employment, she complained to Richard Fife[8] regarding Kahler's treatment of her. Pl. Dep. 97–98. Plaintiff subsequently complained to Hlavaty and supervisor Lamonaca about Kahler's conduct. *Id.* at 101–04. Plaintiff does not recall the specific actions of Kahler she reported to Hlavaty, *id.* at 102, nor does she remember when she made her complaints, *id.* at 104.

Plaintiff testified that Lamonaca promptly responded to her complaint about Kahler's behavior by reassigning Plaintiff at her request to separate her from Kahler. Pl. Dep. 108–09. Plaintiff stated that immediately following her complaint to Hlavaty about Kahler's harassment, the harassment "ceased," and her work environment improved. *Id.* at 231-32. Plaintiff testified she had no complaints about her treatment by any HGV employee other than Kahler. *Id.* at 226.

D. Plaintiff's Termination

Plaintiff was out for almost two months "trying to set up [her carpal tunnel and breast reduction] surgery" Pl. Aff. ¶ 31, ECF No. 71-3;[9] *see id.* ¶ 16. Plaintiff returned to work on April 1, 2013. Pl. Dep. 145. On May 6, 2013, Randy Devaux (Director of Hotel Operations, Hilton Myrtle Beach Resort) contacted Gabriel Armstrong (HGV's Senior Marketing Manager) by email to inform him that two guests of the Hilton Myrtle Beach reported that Plaintiff had made multiple disparaging comments about the Hilton Myrtle Beach during a tour at the Anderson Ocean Club. Devaux noted in his message to Armstrong that because both properties have "Hilton" in their names, Plaintiff's

---

[8] Plaintiff did not recall Fife's job title, but noted he was one of her supervisors. Pl. Dep. 98. An email provided by Defendant lists Fife as the Lead Sales Manager, for HGV, Anderson Ocean Club. ECF No. 59-16.

[9] The court notes that portions of Plaintiff's affidavit contain potentially inadmissible evidence concerning, *inter alia*, the causal relationship between events. A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). However, the portions of the affidavit relaying Plaintiff's recollection of relevant events themselves appropriately are considered at this time. The undersigned has reviewed Plaintiff's affidavit in its entirety. *See* Pl. Aff., ECF No. 71-3.

derogatory remarks about the Hilton Myrtle Beach damaged HGV's reputation as well. May 6, 2013 email from Devaux to Armstrong, ECF No. 60-4. Devaux had no interaction with HGV's timeshare sales representatives, including Plaintiff, and did not know who Plaintiff was prior to contacting Armstrong about this incident. Devaux Dep. 7–8, 13, ECF No. 60-5. Devaux reported this incident in the same manner in which he reported other incidents involving HGV sales personnel. *Id.* at 8–9. Armstrong immediately shared Devaux's report with Lamonaca. May 6, 2013 email from Armstrong to Devaux, copying Lamonaca, ECF No. 60-4. Plaintiff never met Devaux when working for Defendant. Pl. Aff. ¶ 7.

On May 7, 2013, Fife indicated he, Fell, and Brett Ware[10] heard Plaintiff ask some customers, "I told you we don't take 'maybes,' why can't you give me a straight answer to any of my questions[?]" May 7, 2013 email from Fife to Lamonaca, ECF No. 59-16. Plaintiff also told the customers, "Why are you back pedaling[?] You told me across the street one thing and now you're changing everything[.] Why can't you just be honest[?]" *Id.* After witnessing Plaintiff's unprofessional behavior for several minutes, Mr. Fife concluded that he needed to intervene, and the guests asked to be permitted to leave the tour before its conclusion. *Id.* Fife promptly reported this incident to Lamonaca. *Id. See also* Fell Dep. 20–22 (recalling the May 7, 2013 encounter).

Later that day, Lamonaca suspended Plaintiff due to her mistreatment of guests and derogatory remarks about Hilton Myrtle Beach. Pl. Dep. 173. In a detailed memorandum from Lamonaca to Hlavaty, he set out the reasons for Plaintiff's suspension. May 7, 2013 Lamonaca Mem., ECF No. 60-6.[11] Lamonaca referenced the ongoing complaints from customers and coworkers, the complaint to Devaux from the guests to whom Plaintiff made disparaging comments about the Hilton Myrtle Beach, and the incident in which she provided a pill to a customer. *Id.* Plaintiff was suspended for three days pending investigation. *Id.*. Lamonaca also stated that, in his opinion, Plaintiff was a "powder keg," and

---

[10] The record does not indicate Brett Ware's job title.
[11] Lamonaca provided the memorandum at Hlavaty's request. Hlavaty Dep. 53.

recommended that Plaintiff be terminated. *Id.* Hlavaty discussed the prospect of terminating Plaintiff with Lisy Martinez, who was Hlavaty's supervisor at that time. Hlavaty Dep. 40.

On May 11, 2013, Hlavaty and Lamonaca called Plaintiff to inform her of her termination. Hlavaty Notes of May 11, 2013 call, ECF No. 60-7. Lamonaca explained that Plaintiff was being terminated because of her pattern of behavior that was unbecoming of an HGV employee. *Id.* Lamonaca specifically cited the feedback regarding Plaintiff's treatment of guests and coworkers, including Devaux's report of the disparaging comments Plaintiff made regarding the Hilton Myrtle Beach. *Id.* Lamonaca asked Plaintiff if she recalled the February 3, 2013 incident in which Fell reported that Plaintiff gave a Xanax to a customer. *Id.* Plaintiff replied that she did not give Xanax to the customer, but said she gave the customer a pill that was "something less than Xanax." *Id.* Lamonaca responded that giving a customer medication of any kind is unacceptable. *Id.*

On May 13, 2013, Hlavaty and Lamonaca again called Plaintiff because Plaintiff had called Lamonaca the day before to say she did not understand the May 11 phone call. Hlavaty Notes of May 13, 2013 call, ECF No. 60-8. Plaintiff specifically asked whether she was being terminated for giving medication to a customer or whether her termination was due to "other stuff." *Id.* Lamonaca reiterated that he received complaints from timeshare owners, employees at other Hilton locations, and customers on the sales floor, and that Plaintiff admitted had providing medication to a customer. *Id.* During the call, Plaintiff stated she had not received formal write-ups for these matters. *Id.*

II.    Standard of Review

A.    Motions for summary judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing  Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be

instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

B.      Burden of proof in Title VII and ADA claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff does not argue she has presented any direct evidence of discrimination, so the court considers her claims under the burden-shifting framework. Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

While intermediate evidentiary burdens shift back and forth, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the plaintiff. *See Reeves*, 530 U.S. at 146–47 ("The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)).

The *McDonnell Douglas* burden-shifting proof scheme also applies to ADA claims. *See Labor v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (applying the *McDonnell Douglas* framework to an ADA claim).

III.     Analysis

   A.     Plaintiff's Title VII hostile-work-environment claim

Defendant first challenges Plaintiff's hostile-work-environment claim. That claim is focused on the actions of Kahler. *See* Pl. Dep. 226 (noting Kahler was the only Hilton employee about whom she had complaints concerning how she was treated). To establish a prima facie case of harassment or hostile work environment[12] under Title VII, "a plaintiff must show 'that the offending conduct (1) was unwelcome, (2) was because of her [gender], (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer.'" *Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F. 3d 325, 331 (4th Cir. 2003)). The "severe or pervasive" element "has both subjective and objective components." *Ocheltree*, 335 F.3d at 333. First, a plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21–22 (1993). Next, a plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998).

Whether an environment is objectively hostile or abusive depends on factors such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. This standard is designed to "filter out complaints

---

[12] As noted in *DeClue v. Central Illinois Light Co.,* 223 F.3d 434, 437 (7th Cir. 2000), "[s]exual harassment is the form of sex discrimination in the terms or conditions of employment that consists of efforts either by co-workers or supervisors to make the workplace intolerable or at least severely and discriminatorily uncongenial to women ("hostile work environment" harassment) . . . ." Accordingly, cases discussing harassment claims may be relevant to this analysis.

attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotation omitted). "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006). "Harassment reaches the sufficiently severe or pervasive level when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself subjectively perceive[s] . . . to be abusive.'" *Jennings v. Univ. of N.C*, 482 F.3d 686, 696 (4th Cir. 2007) (quoting *Harris*, 510 U.S. at 21). General complaints of rude treatment are not sufficient to sustain a hostile work environment claim. *See, e.g., Baqir v. Principi,* 434 F.3d 733, 747 (4th Cir. 2006). The federal anti-discrimination statutes do not protect employees from hostility and abuse from their supervisors unless the objectionable conditions occur because of a protected characteristic. *See Graham v. Prince George's Cnty.,* 191 F. App'x 202, 204 (4th Cir. 2006) (finding the district court did not err in determining that "although [the] facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic").

A plaintiff asserting a hostile work environment claim must show that "but for" a protected characteristic, she would not have been a victim of the alleged harassment. *See, e.g., Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (affirming grant of summary judgment of hostile-work-environment claim as plaintiff had not provided evidence the complained-of conduct was motivated by plaintiff's protected trait). Defendant argues Plaintiff cannot establish a prima facie hostile-work-environment claim because she cannot demonstrate that "but for" her age, gender, or national origin, she would not have been harassed nor can she demonstrate conduct that was "sufficiently severe or pervasive" to alter employment conditions and create an abusive work environment. Def. Mem. 13–17. In arguing Plaintiff cannot satisfy the protected-trait element, Defendant focuses on Plaintiff's deposition testimony in which she admitted Kahler treated male and female employees in the same way. In

Plaintiff's deposition, she called Kahler an "equal opportunity jerk," and noted that both male and female employees were complaining about how Kahler treated them. Pl. Dep. 113; *see also id.* at 226 (stating Kahler "was a jerk" to "everybody, male and female. He didn't discriminate.").

Plaintiff's response does not address the "equal-opportunity-jerk" testimony noted by Defendant. Rather, she submits she was "subjected to commentary based on her sex, her weight, her national origin, and her religion. Pl's Mem. 15. She claims that the commentary "regarding her sex and her religion are both protected traits under Title VII." *Id.*[13] "Specifically," Plaintiff continues, she was "subjected to comments regarding her body as a woman, her weight, her titties." *Id.* Plaintiff provides no record citation for this argument, and the court need not comb the record for factual support.

Nonetheless, the undersigned has reviewed all record evidence provided and notes the following as potentially germane to this claim:[14]

- Kahler allegedly indicated he did not know why she would "get [her] titties reduced" because she "look[s] good with them." Pl. Dep. 224–25 (regarding Kahler's statement to Plaintiff).

- Kahler would "call [Plaintiff] his token Yankee," and ask if she celebrated Cinco de Mayo "like I'm a Mexican," and would make "snide remarks[.]" *Id.* at 100.

- In Plaintiff's affidavit provided with her response to Defendant's Motion, she avers:

  > 9. Many of the women I worked with were subjected to derogatory commentary by Kahler.

  > 10. That during my employment my direct supervisor made several negative comments to me including but not limited to I was the token Yankee, that [] if I lost some weight I may get a man, that I was not Hilton material, etc. That I was constantly disrespected and called names by Kahler. Kahler informed me that I did not have the class to work for Hilton. Mr. Kahler went out of his way to make me feel bad about myself. Kahler made comments regarding my hair color, my religion and my Hispanic heritage. Mr. Kahlor [sic] made constant commentary [that] made my work environment hostile.

---

[13] Defendant notes on reply that Plaintiff did not allege in her administrative charge or the Complaint in this matter that she was discriminated against because of religion or weight. Def. Reply 2. The undersigned agrees that such comments need not be considered further.

[14] This list is intended to be representative of Plaintiff's evidence and argument. The list is not exhaustive, nor does inclusion on this list suggest that the statements are admissible in this context. *See Latif*, 354 F. App'x at 830.

13

11. Mr. Kahler in fact on several occasions told me that there was no place for my kind in business based on my Spanish heritage.

Defendant submits that, considering all allegations in the light most favorable to Plaintiff, Kahler's conduct of calling her a "token Yankee," asking once about Cinco de Mayo, and making one comment about her breasts, "at most amounts to occasional teasing or insensitive behavior." Def. Mem. 16. These comments, Defendant argues, are insufficient to change the terms and conditions of employment" required for this claim. *Id.* (citing, *inter alia*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)). In *Breeden*, the Court explained that "simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" as required to maintain a hostile work environment claim. 532 U.S. at 271. Further, Defendant submits that general complaints of rude treatment will not sustain a hostile work environment claim. *See Baqir*, 434 F.3d at 747; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("Complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII.") (internal citations, quotations, and punctuation omitted).

Defendant also argues Plaintiff has provided no specific evidence that she was discriminated against on account of her national origin, noting this deposition testimony:

Q. All right. Do you have any reason to believe that [Kahler] singled you out for any treatment because of your national origin?
A. I don't know if he did or not. He was just a mean man.

Pl. Dep. 228. *See* Def. Mem. 14.

In response, Plaintiff focuses on the Supreme Court case of *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-66 (1986), as "specifically stating Title VII affords employees the right to a work environment free from discriminatory intimidation, ridicule, and insult." Pl. Mem. 17. This overstates *Meritor Saving's* discussion of Title VII's hostile-work-environment protection. The

*Meritor Savings* Court did note that, in finding "hostile-work-environment [] harassment violates Title VII, *the EEOC drew upon a substantial body of judicial decisions and EEOC precedent* holding that Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." 477 U.S. at 65 (emphasis added) (citing, *inter alia, Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)). However, the *Meritor Savings* Court's discussion continued, noting that "[o]f course, as the courts in both *Rogers* and *Henson [v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982)] recognized, not all workplace conduct that may be described as 'harassment' affects a 'term condition or privilege' of employment within the meaning of Title VII." 477 U.S. at 67. Rather, "[F]or sexual harassment to be actionable, it must sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* (quoting *Henson*, 682 F.2d at 904).

Plaintiff acknowledges that she must establish not only that she saw the actions as hostile, but that a reasonable person would also. Pl. Mem. 17. She also notes that a "few isolated comments would not be considered to be severe and persuasive." *Id.* Plaintiff seems to argue she has satisfied these requisites: "In this case the comments were not isolated nor was the harassment regarding the actions taken by the Defendant." *Id.* Plaintiff also baldly states that "the actions of the Defendant affected the Plaintiff's ability to be comfortable in her position." *Id.*

Having considered all admissible evidence, the arguments, and applicable law, the undersigned recommends finding Plaintiff has not established her prima facie case of a hostile work environment. As an initial matter, Plaintiff's response contains very little admissible specific evidence of statements or behavior that could be considered "harassing" based on gender or national origin. Giving Plaintiff every benefit of the doubt, the only arguably specific incident she has provided is Kahler's one-time comment regarding her breasts in which he questioned why she would have breast-reduction surgery.

Much of the other evidence and argument Plaintiff provides are not sufficiently specific and/or are not based on Plaintiff's own knowledge to constitute competent evidence. For example, Plaintiff's

statement that "many of the women that I worked with were subjected to derogatory commentary by Kahler," Pl. Aff. ¶ 9, does not suffice. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). Here, Plaintiff provides no specific information to support this claim.

Even assuming, *arguendo*, that Plaintiff has provided at least scant evidence of Kahler's action that could be considered to be related to a protected trait, Plaintiff cannot satisfy the "severe and pervasive" element of her prima facie case because she has not set forth evidence of an environment that a reasonable person objectively would find to be hostile or abusive. In considering the objective portion of the severe-and-pervasive element, the court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. As one court explained, "standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking 'the ordinary tribulations of the workplace." *Wang v. Metro. Life Ins. Co.,* 334 F. Supp. 2d 853, 864 (D. Md. 2004). As the Fourth Circuit noted, "[b]ecause we have 'recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test,' *Sunbelt,* 521 F.3d at 315, [Plaintiff] must show that the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere, *Jennings v. U.N.C.,* 482 F.3d 686, 695 (4th Cir.2007) (en banc)." *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009).

Kahler's comments to Plaintiff do not rise to the level of hostile or abusive. The evidence of specific, potentially discriminatory comments is isolated at best. Plaintiff's evidence does not show the HGV workplace was "pervaded with discriminatory conduct." *Sunbelt*, 521 F.3d at 315. Plaintiff's claims of Kahler's "constant commentary," and her being "constantly disrespected" by Kahler, *see* Pl.

Aff. ¶ 10, are not sufficient. At best, Plaintiff's evidence of any "pervasive" conduct by Kahler is of the inappropriate, but not discriminatory variety. *E.g.* Pl. Dep. 113 (noting Kahler was an "equal opportunity jerk, both male and female").[15] She has not presented evidence of actions that would unreasonably interfere with her work performance such that a reasonable jury could find a hostile work environment. *See Sunbelt Rentals, Inc*., 521 F.3d at 315–16 (noting complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).[16]

Plaintiff's hostile-work-environment claim should be dismissed as a matter of law.

B.    Plaintiff's Title VII discrimination claim

Plaintiff terms her second cause of action one for "Sexual Harassment/Discrimination," brought under Title VII. Compl. ¶¶ 109-25.[17] Defendant moves for summary judgment on this discrimination cause of action, arguing Plaintiff cannot establish a prima facie case. Def. Mem. 18-22. When, as here, a plaintiff has not proffered direct evidence of discrimination, she may proceed under the *McDonnell Douglas* burden-shifting paradigm. Defendant argues Plaintiff's cannot establish a prima facie case of Title VII discrimination. To establish a prima facie case, that (1) she is a member of a protected class; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of her discharge; and (4) the discharge arose under circumstances permitting a reasonable inference of illegal

---

[15] In another section of her memorandum, Plaintiff submits that her "equal opportunity jerk" statement does not bind her as a factual or legal conclusion. Rather, Plaintiff argues Defendant was "aware of [Kahler's] previous propensities for being discriminatory." Pl. Mem. 21 (citing generally to her affidavit). The undersigned's recommended finding that Plaintiff has not established a prima facie hostile-work-environment claim does not hinge on Plaintiff's choice of the words "equal opportunity jerk." By the same token, however, Plaintiff's oblique reference to Kahler's "previous propensities for being discriminatory," unaccompanied by reference to specific evidence, does not change the undersigned's recommended finding that Plaintiff has not established an objectively hostile gender-based environment.

[16] The undersigned agrees with Defendant that Plaintiff's claim of having established pretext is inapplicable to the hostile-work-environment claim. *See* Pl. Mem. 17–18, Def. Reply 4 n.2.

[17] To the extent Plaintiff's second cause of action is one for harassment pursuant to an allegedly hostile work environment, the analysis of Section III A, *supra*, is also applicable.

discrimination. *See, e.g., Reynolds v. Am. Nat'l Red Cross,* 701 F.3d 143, 150 (4th Cir. 2012); *Adams v. Trs. of the Univ. of N.C. Wilmington*, 640, F.3d 550, 558 (4th Cir. 2011); *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *Rohan v. Networks Presentations, LLC,* 375 F.3d 266, 272 n.9 (4th Cir. 2004); *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir. 2004) (en banc), *abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517 (2013); *Dugan v. Albemarle Cnty. Sch. Bd.,* 293 F.3d 716, 720 n.1 (4th Cir. 2002); *EEOC v. Sears Roebuck & Co.,* 243 F.3d 846, 851 (4th Cir. 2001); *Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir. 1995).

It is undisputed that, as a female, Plaintiff is part of a Title VII-protected class. Defendant argues Plaintiff cannot establish any of the other three prima facie factors. The undersigned considers the adverse-employment-action factor first.

### 1. Adverse employment action

For purposes of a Title VII discrimination claim, "[a]n adverse employment action [AEA] is action that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks and citation omitted). Typical examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

Based on allegations in the Complaint and Plaintiff's deposition testimony, Defendant submits Plaintiff has not demonstrated an adverse employment action in this context. Def. Mem. 18–19, 21–22. The Complaint refers to "significant harassment by Kevin Kaylor[,]" and avers Lamonaca "failed and refused to handle the situation." Compl. ¶¶ 114–15. Importantly, the second cause of action does not reference Plaintiff's suspension or termination. Defendant argues Plaintiff has not shown that Kahler's alleged harassment negatively impacted her employment status. Def. Mem. 21. Defendant notes Plaintiff's testimony that once she requested to be transferred so that she would not interact with

Kahler, Lamonaca granted the request promptly. *Id.* (citing Pl. Dep. 108–09). Plaintiff stated conditions improved after she was no longer working for Kahler. Pl. Dep. 231–32. Because, based on her own testimony, Kahler's alleged harassment did not adversely impact her employment, Defendant argues Plaintiff's prima facie discrimination claim fails.

Plaintiff's response seems to alternately refer to Kahler's harassment and her suspension/termination as the relevant AEA in her second cause of action. Without explanation, Plaintiff first states the AEA-component of her discrimination claim is satisfied because of her suspension and termination. Pl. Mem. 19. A few pages later, though, Plaintiff focuses on the "constant beratement by Kahler" itself as an adverse employment action, claiming that courts "have more recently determined that an adverse employment action may include employer actions which result in non-monetary effects on the Plaintiff." Pl. Mem. 21. As support, Plaintiff cites a case from this District that found that inquiry should be made beyond comparing the salaries of two positions when a denied lateral promotion is the alleged adverse employment action. *Id.* (citing *Fleming v. S.C. Dept. of Corr.*, 952 F. Supp. 283, 288 (D.S.C. 1996)). Then, however, Plaintiff argues: "When considering the Plaintiff['s] whole work environment, the harassment, the suspension and termination the Plaintiff suffered an adverse employment action by Kahler. The Plaintiff['s] sex was a consideration when each of the Adverse Employment Actions was taken." *Id.*

To the extent the Plaintiff's alleged harassment by Kahler is the AEA component of her Title VII discrimination prima facie claim, that claim should be ended as a matter of law for the reasons discussed above in finding Plaintiff did not establish Kahler harassed her by creating an actionable hostile work environment. In other words, because Plaintiff has not established actionable harassment by Kahler, she cannot demonstrate the AEA prong of her prima facie discrimination claim with her harassment allegations.

Of course, an employee's termination itself is undoubtedly considered to be an AEA. Here, though, Plaintiff asks that the court consider the totality of the "work environment, the harassment, the

suspension and termination" to find that Plaintiff "suffered an adverse employment action by Kahler." Pl. Mem. 21. The only argument Plaintiff seems to advance that could potentially connect Kahler to Plaintiff's termination was that he was "one of the individuals relied upon to supply the information" to Lamonaca when terminating Plaintiff. *See* Pl. Mem. 19. However, the termination was based on information from various supervisors and colleagues, not just Kahler.

In any event, assuming for the sake of argument that Plaintiff has satisfied the AEA prong of her Title VII discrimination claim, Plaintiff must also establish the remaining prongs of her prima facie case.

### 2. Job performance

Defendant also argues Plaintiff cannot establish a prima facie case because she has not shown she was performing her job in a satisfactory manner at the time she was terminated. Def. Mem. 19–21, *see also id.* at 4–6, 9–11 (referring to testimony and documents concerning issues with Plaintiff's behavior and her sales performance numbers).

In response, Plaintiff submits she has established she was performing satisfactorily. Pl. Mem. 19–20. She intimates the May 7, 2013 Lamonaca memorandum in which he set out reasons for Plaintiff's termination that day (ECF No. 60-6) is not competent evidence because its author, Lamonaca, was not available for questioning and one of the sources mentioned was Kahler, Plaintiff's alleged harasser. Pl. Mem. 19. In particular, Plaintiff takes issue with Lamonaca's contention "that Plaintiff was counseled on several occasions for being rude to customers." *Id.* Plaintiff argues a material factual dispute exists as to her alleged rudeness to customers in that there had been "only one incident where a guest was actually upset and asked to leave and that is only substantiated by a current employee and not by the Plaintiff." *Id.*[18] Plaintiff also submits that she has created "a genuine issue of material fact as to the reasons given in [the Lamonaca memorandum] as to her actual termination." *Id.* at 20, *see also id.* at 19. Plaintiff "adamantly denies" the allegation that she gave a customer a

---

[18] Notably, however, Plaintiff does not argue the instances of "rude" behavior did not occur.

prescription drug, noting her coworker Fell did not confirm she gave the customer "an actual drug." *Id.* at 19–20.[19] Plaintiff stated in her affidavit that she "always believed [her]self to have good numbers." Pl. Aff. ¶ 8.

The undersigned agrees with Defendant that Plaintiff has not established this prong of her prima facie case. As an initial matter, Plaintiff's opinion of her own abilities is not relevant. Rather, as a matter of law, courts consistently find it to be the *employer's* perception of job performance, and not the employee's, that is controlling. *See Holland v. Wash. Homes Inc.,* 487 F.3d 208 (4th Cir. 2007) (finding a court's focus is on the perception of the decision-maker, that is, whether the employer believed its stated reason was credible); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (disregarding the plaintiff's opinions of her own performance because "[i]t is the perception of the decision-maker which is relevant, not the self-assessment of the plaintiff").

Regarding the Lamonaca memorandum, ECF No. 60-6, the undersigned notes that Lamonaca addressed the memorandum to Hlavaty. Hlavaty testified Lamonaca prepared that memorandum for her at her request after he had placed Plaintiff on suspension during his May 7, 2013 meeting with Plaintiff. Hlavaty Dep. 53 (noting Hlavaty asked Lamonaca to put into writing the concerns about Plaintiff and to provide any other documentation). Further Hlavaty participated in two telephone calls with Plaintiff and Lamonaca and has provided her notes of those calls. *See id.* at 51–52; Notes, ECF Nos. 60-7 (May 11, 2013) and 60-8 (May 13, 2013).

Plaintiff questions Lamonaca's assertion in the memorandum that Plaintiff had been "counseled on several occasions for being rude to customers," noting there is no documentation of such counseling. She also denies having given a customer a controlled substance. Pl. Mem. 19–20. Even considering these facts in the light most favorable to Plaintiff, the undersigned is of the opinion Plaintiff has not established her prima-facie claim of having been performing satisfactorily. Regardless

---

[19] To the extent Plaintiff challenges the timing of when Defendant raised issues concerning her conduct and performance, that challenge is more appropriately considered in the retaliation context.

of whether Plaintiff had received formal counseling prior to May 2013 as to her "rude" behavior, the record contains emails and deposition testimony of her rude behavior. *E.g.,* Fell Dep. 13, 16–17, 19–22; Fife email to Lamonaca; Devaux email, Devaux Dep. 8. Plaintiff's argument that there is only "one incident where a guest was actually upset and asked to leave" because of Plaintiff's behavior that is substantiated by one employee (Richard Fife, discussed in Fell deposition) but not substantiated by Plaintiff misses the point. If, based on information from Devaux, Fife, Fell, and others, the perception of Defendant was that Plaintiff's attitude with customers was not satisfactory; Plaintiff does not create an issue of fact by disagreeing or failing to substantiate an anecdote. *Howard v. Coca Cola Bottling Co. Consol.*, No. 4:12-CV-2647-RBH, 2014 WL 897334, at *5, 14 (D.S.C. Mar. 6, 2014) (considering plaintiff's testimony that she did not falsify time records as her opinion she was performing satisfactorily but finding it insufficient to demonstrate prima facie element of satisfactory job performance as to Title VII discrimination claim).

Plaintiff cannot establish this element of her prima facie discrimination claim. In any event, the undersigned also considers the final prong of the prima facie case.

### 3. Inference of illegal discrimination

Even if Plaintiff were found to have established the other prongs of her prima facie discrimination case, Defendant submits Plaintiff cannot establish the fourth prong of the prima facie case because she has not shown that similarly situated male employees were treated more favorably. Def. Mem. 22. In response, Plaintiff does not discuss that formulation of the fourth prima-facie element, but submits she satisfies that portion of the prima facie case because her position was not filled after she was terminated. Pl. Mem.18–19. On reply, Defendant does not respond to that portion of Plaintiff's response, but reiterates its original argument, focusing principally on testimony from Plaintiff and from Hlavaty that Kahler treated males and females similarly. Def. Reply 5–6.

Plaintiff provides no authority for her formulation of the fourth prong as including a showing that the position was not filled upon termination, nor did Defendant respond to that portion of

Plaintiff's argument on reply. Ultimately, the exact standard is flexible depending on the facts and claims alleged. *See Ennis,* 53 F.3d at 59 ("Although we accept the *McDonnell Douglas* framework as a useful tool, it should not be applied in a 'rigid, mechanized, or ritualistic' manner." (citations omitted)). In *Hill,* 354 F.3d at 285, the Fourth Circuit considered the fourth prima facie element in a termination case to be that "(4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill,* 354 F.3d at 285.

Although neither party directs the court to record evidence concerning whether Plaintiff's position was filled, Plaintiff submits in her memorandum that she was "not replaced." Pl. Mem. 19. Because Defendant is silent on this point, out of an abundance of caution, the undersigned will assume Plaintiff satisfied this element of a prima facie Title VII discrimination case and will consider whether Plaintiff can establish pretext.

### 4. Pretext analysis

Even if it were determined that Plaintiff had satisfied her prima facie case, summary judgment as to her Title VII discrimination claim remains appropriate. Defendant has met its burden of producing legitimate non-discriminatory reasons for the termination: that Plaintiff was terminated based on various incidents of her inappropriate behavior with customers, failure to follow policy in signing a document, and her sales numbers. Although Plaintiff takes issue with some of the incidents, Defendant's burden is a burden of production, not persuasion, at this juncture, *Reeves*, 530 U.S. at 142, and involves no "credibility assessment," *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514 (4th Cir. 2006). Rather, Defendant need only produce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable action." *Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (citations omitted)). Defendant has satisfied its burden.

The burden shifts back to Plaintiff, then, to establish the reason given for her termination was merely pretextual by demonstrating by a preponderance of the evidence that the proffered reason was

23

"not its true reason[ ], but [was] a pretext." *Burdine*, 450 U.S. at 253. The undersigned is mindful of Plaintiff's questioning of the underlying facts regarding the reasons given for her suspension and termination. Here, though, the court is not to determine whether the reason Defendant has given for terminating Plaintiff "was wise, fair, or even correct, ultimately, so long as it truly was the reason for [her] termination." *DeJarnette*, 133 F.3d at 299. Further, the issue of pretext is whether the employer is lying; mistakes of fact are not evidence of unlawful discrimination. *Price v. Thompson,* 380 F.3d 209, 214 n.1 (4th Cir. 2004)

Further, to the extent Plaintiff seeks to demonstrate pretext because Defendant did not follow its usual procedures by failing to put all incidents in writing, *see* Pl. Mem. 30–31, such argument is unavailing. An employer's unfair deviation from employer's termination procedures or failure to adhere to common notions of fairness in the termination process is not probative of an intent to discriminate and cannot show pretext. *See, e.g., Corbell v. City of Holly Hill*, No. 5:13-CV-00324-JMC, 2014 WL 4722194, at *8 (D.S.C. Sept. 22, 2014) (finding no pretext in ADA wrongful termination claim and collecting cases supporting proposition that employer's failure to follow its own procedures in termination not probative of same).[20]

---

[20] In *Corbell*, the court noted the following cases in finding summary judgment was appropriate:

> *See, e.g., Duggan v. Sisters of Charity Providence Hospitals,* 663 F.Supp.2d 456, 470 n. 6 (D.S.C. 2009) (rejecting plaintiff's attempt to establish pretext by pointing out that the defendant rushed to judgment to terminate him, failed to interview witnesses or the plaintiff himself, failed to follow its own policy, and failed to consult with the plaintiff's supervisor before deciding to terminate him); *Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir.1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."); *Babbar v. Ebadi,* 36 F. Supp. 2d 1269, 1279 (D. Kan. 1998) (stating that evidence that the employer deviated from procedures during the adverse employment action "goes only to process and not to purpose or motivation, and could not provide a sufficient basis for a jury to find pretext for discrimination") (internal quotations omitted); *see also Jacobs v. Delta Air Lines, Inc.,* Nos. 97–6100, 97–6143, 1998 WL 514620, at *3 (10th Cir. Aug. 13, 1998) (stating that plaintiff's assertion of poor investigation "challenges the process applied rather than [the employer's] purpose or motivation" and cannot support an inference of pretext).

*Corbell*, 2014 WL 4722194 at *8.

Finally, in the section of her memorandum concerning hostile-work-environment allegations, Plaintiff compares the timing of her termination with the timing Defendant learned of the "drug" incident (February 2013) and the timing of her complaint to HR, stating, "The inference is clear that the Plaintiff has overcome any rational[e] by the Defendant." Pl. Mem. 17–18. Plaintiff submits there is an "issue of material fact" as to whether she was terminated for the reasons Defendant advances now or whether "what actually happened [is] that she was subjected to a hostile work environment[,] complained about discrimination[,] and as a result was suspended and terminated from her employment." *Id.* at 18.

As more fully discussed above, the undersigned is of the opinion Plaintiff has not set out an actionable claim of a hostile-work-environment. That Plaintiff was terminated because she complained about discrimination is considered below in her Title VII retaliation claim. "A plaintiff is entitled to a trial on the merits of a Title VII claim if [she] . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination." *Darvishian v. Green*, 404 F. App'x 822, 828 (4th Cir. 2010). Plaintiff has not carried this burden.

Plaintiff has failed to provide evidence showing that Defendant's proffered reasons were pretextual. *See Brunson v. McHugh*, No. CA 3:11-2013-JFA-SVH, 2012 WL 1932717, at *5 (D.S.C. Apr. 18, 2012), *report and recommendation adopted,* No. 3:11-CV-2013-JFA, 2012 WL 1932687 (D.S.C. May 29, 2012) (noting plaintiff's disagreement with reports that were considered in terminating her, but finding such disagreement did not establish pretext). Because no reasonable jury could conclude that sexual discrimination was a motivating factor in Plaintiff's termination, summary judgment is appropriate as to Plaintiff's Title VII wrongful termination claim.

C.      Retaliation

Plaintiff also brings a Title VII retaliation claim. Compl. ¶¶ 126–34. Title VII proscribes discrimination against an employee because, in relevant part, she "has opposed any practice made an

unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). Employees engage in protected oppositional activity when, *inter alia*, they "complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.,* 333 F.3d 536, 543–44 (4th Cir. 2003). When, as here, direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *See Foster v. Univ. of Md.-Eastern Shore,* 787 F.3d 243, 249 (4th Cir. 2015) (confirming the *McDonnell Douglas* framework remains appropriate when Title VII retaliation plaintiff is not proceeding under direct-evidence theory). "To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove '(1) that she engaged in a protected activity,' as well as '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405–06 (4th Cir. 2005)). If the plaintiff presents a prima facie case, the burden then shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or her claim will fail. *See Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). In the Title VII retaliation context, a plaintiff must prove retaliation was the but-for cause of the adverse employment action. *See Nassar*, 133 S. Ct. at 2533. In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524–25. In *Foster*, the Fourth Circuit clarified that the but-for causation standard is not applied at the prima facie stage; rather, the but-for causation requirement is part of plaintiff's proof at the pretext stage. 787 F.3d at 252.

Again, Plaintiff seeks to prove this claim using the *McDonnell Douglas* framework. Plaintiff must establish she participated in protected activity, Defendant took an adverse employment action against her, and there was a causal link between the two. *Boyer-Liberto*, 786 F.3d at 281.

1. Prima facie case

a. Treatment by Kahler

In its Motion for Summary Judgment, Defendant argues summary judgment is appropriate as to the Title VII claim, focusing only on Plaintiff's complaints about Kahler—complaints she testified she made to Fife, Hlavaty, and Lamonaca on unspecified dates. Def. Mem. 30 (citing Pl. Dep. 97–98, 101–04; Compl. ¶ 130). Defendant does not question these complaints were protected activities or that Plaintiff suffered the adverse employment action of termination.[21] Rather, Defendant argues Plaintiff cannot satisfy the prima facie case because she cannot show the presence of a causal relationship between those complaints and her termination, claiming Plaintiff's misconduct and performance issues that took place after she complained about Kahler broke any causal connection that may have existed. Def. Mem. 31. Defendant also submits Plaintiff cannot survive summary judgment by demonstrating pretext. *Id.* at 32–34.

b. The alleged May 7, 2013 discrimination complaint

In response to Defendant's Motion, Plaintiff cites to her EEOC Charge in discussing her protected activity. In relevant part, Plaintiff references the following:

II. Prior to my termination I complain[ed] to Human Resources regarding Sexual Harassment. 2 weeks after my complaint I was terminated from my employment.
. . .
VII. That on May 7, 2013 I made a report regarding discriminatory actions on the part of defendant and its supervisors regarding my national origin, sex, perceived disability, and age.

---

[21] To the extent Plaintiff now also argues that a hostile work environment ensued in retaliation of her participating in a protected act, Pl. Mem. 30, the undersigned agrees with Defendant that she cannot now expand her discrimination claim to include that additional ground, *see* Def. Reply 8. *See White v. Roche Biomedical Labs., Inc.,* 807 F. Supp. 1212, 1216 (D.S.C. 1992) (noting "a party is generally not permitted to raise a new claim in response to a motion for summary judgment"); *see also Horton v. Donley*, No. C/A 3:07-2316-MBS, 2009 WL 2782226, at *10 (D.S.C. Aug. 27, 2009) (same, quoting *White*). As discussed above, Plaintiff has not established the existence of a hostile work environment, nor has she cited any record evidence or otherwise expounded upon this one-paragraph argument. Any retaliation claim focused on the adverse action of a hostile work environment should be dismissed as a matter of law.

Pl. Mem. 1–2 (quoting Feb. 18, 2014 EEOC Charge, attached as ECF No. 71-2 at 1). The attached one-page charge includes Plaintiff's notarized signature but the Charge is undated and does not include an EEOC Charge Number. Plaintiff also provides her right-to-sue letters, which do contain Charge numbers (S.C. State Human Affairs Commission Charge No. 3-14-129 D/A/S/NO/RET; EEOC Charge No. 436-2014-00365), ECF No. 71-2 at 2–3.

Elsewhere, Plaintiff states that on May 7 she "made a complaint of discriminatory acts on the part of her supervisors to the Human Resources Office[, but] Human Resources contends the only complaint received was that the Plaintiff was not being paid properly." Pl. Mem. 9 (citing Charge and Hlavaty Dep. 45). Plaintiff's Complaint includes the same quoted paragraphs from the Charge. Compl. ¶ 13, subsections II, VII (referencing Charge). The Charge itself is not attached to the Complaint, although the right-to-sue letters are.

Elsewhere in the "Factual Background" section of the Complaint, Plaintiff avers:

61. That 30 days prior to the Plaintiff's termination the Plaintiff reported Kevin Kaylor [sic] for hostile work environment based on national origin discrimination, age discrimination, and sexual harassment.

Compl. ¶ 61.

In her affidavit, Plaintiff avers that she "informed [her] employer of certain complaints regarding [her] employment, hostile work environment, differential treatment based on sex, national origin and religious discrimination." Pl. Aff. ¶ 21. She was terminated "not long after [her] complaints to human resources regarding the working environment." *Id.* ¶ 22.

Plaintiff testified that at some point during her employment, she complained to Richard Fife regarding Kahler's treatment of her. Pl. Dep. 97–98. Plaintiff subsequently complained to Hlavaty and supervisor Lamonaca about Kahler's conduct. *Id.* at 101–04. Plaintiff does not recall the specific actions of Kahler she reported to Hlavaty, *id.* at 102, nor does she remember when she made her complaints, *id.* at 104. She characterized the meeting with Hlavaty as having taken place "quite some time" before her termination. *Id.* at 104. Further, in her deposition, Plaintiff acknowledged that she

made no further formal or informal complaints about Kahler after her meeting with Hlavaty. *Id.* at 115, ECF No. 72-2.

Plaintiff testified that Lamonaca promptly responded to her complaint about Kahler's behavior by reassigning Plaintiff at her request to separate her from Kahler. Pl. Dep. 108–09. Plaintiff stated that immediately following her complaint to Hlavaty about Kahler's harassment, the harassment "ceased," and her work environment improved. *Id.* at 231–32. Plaintiff had no complaints about the manner in which she was treated by any HGV employee except Kahler. Pl. Dep. 226.

Plaintiff's argument there was a May 7, 2013 "complaint" that is the cause of her termination is far from clear. Plaintiff must do more to establish her prima facie case. She must provide evidence to support her claims. Her oblique references to having made a "report regarding discriminatory actions on the part of defendant and its supervisors regarding my national origin, sex, perceived disability, and age" on May 7, 2013, is insufficient. Plaintiff has proffered no evidence showing Defendant was aware of a May 7, 2013 "complaint" that would be protected activity. *See Evans v. Wilson Trucking Co.*, No. CV 6:15-887-BHH-KFM, 2016 WL 4385871, at *11 (D.S.C. July 26, 2016), *report and recommendation adopted,* No. CV 6:15-887-BHH, 2016 WL 4269549 (D.S.C. Aug. 15, 2016) (finding summary judgment appropriate when plaintiff had not provided evidence protected activity occurred, noting plaintiff's deposition testimony that he had not made a complaint). On reply Defendant notes factual inconsistencies between Plaintiff's focus on May 7 as the date she made a "complaint" and her deposition testimony. In her deposition, Plaintiff indicated she made a complaint "quite some time" before her termination. Pl. Dep. 104. *See* Def. Reply. 10 n.3.

To accept Plaintiff's version of facts is, of course, appropriate. In this situation, however, the burden is on Plaintiff to demonstrate she participated in protected activity that caused retaliatory action. Without any detail of the substance of Plaintiff's unsubstantiated statement that she made a "report regarding discriminatory actions" on May 7, 2013, the undersigned is of the opinion Plaintiff cannot establish a prima facie case of retaliation as to the alleged May 7, 2013 activity.

In any event, the undersigned notes Defendant focuses on Plaintiff's May 7 argument in its pretext analysis. The undersigned notes Plaintiff's burden in establishing prima facie causation in a Title VII retaliation claim is "less onerous" that the burden of establishing causation at the pretext stage. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). Assuming without deciding that Plaintiff can establish a prima facie case the undersigned considers Plaintiff's Title VII retaliation claim under *McDonnell Douglas*'s burden-shifting scheme.

### p2. Pretext

If the plaintiff presents a prima facie case, the burden then shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or her claim will fail. *See Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). In the Title VII retaliation context, a plaintiff must prove retaliation was the but-for cause of the adverse employment action. *See Nassar*, 133 S. Ct. at 2533. In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524–25. In *Foster*, the Fourth Circuit clarified that the but-for causation standard is not applied at the prima facie stage; rather, the but-for causation requirement is part of plaintiff's proof at the pretext stage. 787 F.3d at 252.

For the reasons discussed above in connection with Plaintiff's Title VII discrimination claim, the undersigned finds Defendant has established a legitimate, non-retaliatory reason for terminating Plaintiff. To survive summary judgment in the retaliation context, Plaintiff must demonstrate those reasons are pretextual and retaliation was the but-for cause of her termination. *Nassar*, 133 S. Ct. at 2533. The undersigned agrees with Defendant that Plaintiff cannot do so, making summary judgment appropriate as to the Title VII retaliation claim.

Again, Plaintiff argues she has established questions of fact "regarding the Defendant's alleged disciplinary actions[,]" noting there are no documents to support Lamonaca's statement in his May 7,

2013 memorandum that Plaintiff had previously been counseled for being rude to customers. Pl. Mem. 30–31. However, Plaintiff does not contest the record evidence provided by Defendant concerning various incidents concerning her allegedly rude behavior with guests, one of which was received by her supervisor on May 6, 2013. *See* email regarding comments on Hilton Hotel, ECF No. 60-4 at 2. *See also* Fell Dep. 13, 16–17, 21–22; Kahler Dep. 6.

Plaintiff questions the timing of her May 7, 2013 suspension and May 11, 2013 termination. She does not deny the information in the various counseling memoranda (*e.g.*, April 24, 2012 Documentation of Counseling Session regarding improperly signing document, ECF No. 59-9; Documentation of Counseling Sessions from May, June, July, and October 2012 regarding sales performance metrics, ECF No. 59-11). Rather, Plaintiff submits these counseling documents had existed for months but did not "become an issue" until she complained of discriminatory and harassing behavior. Plaintiff again disputes that she ever gave a Xanax or pill to a customer but also suggests the only reason Defendant discussed the matter with her on May 7, 2013, was because of her "complaint to Human Resources on May 7, 2013." Pl. Mem. 17; *see* Pl. Mem. 30–32.

As noted above, in considering pretext, Plaintiff must do more than simply deny that events occurred. It is not for the court to determine whether the reason Defendant has given for terminating Plaintiff "was wise, fair, or even correct, ultimately, so long as it truly was the reason for [her] termination." *DeJarnette*, 133 F.3d at 299. Defendant has provided emails and testimony concerning Plaintiff's providing a pill to a customer. Defendant has provided emails and testimony of several incidents in which Plaintiff's behavior with customers was inappropriate. Plaintiff acknowledged that she had no reason to believe that Fell, who had provided management with information about the pill incident, would have fabricated the incident. Pl. Dep. 167.

Further, regarding the time lapse from the February 3, 2013 pill incident until the May 7, 2013 suspension, review of all record facts in the light most favorable to Plaintiff does not establish pretext. Rather, the record evidence indicates the encounter took place on February 3, 2013, and Fell emailed

Lamonaca the next day, February 4, 2013 to advise him. ECF No. 59-12. Plaintiff went on medical leave around February 5, 2013. Feb. 5, 2013 email from Hlavaty to Lamonaca, ECF No. 60 (noting Plaintiff "is looking to be out today [February 5, 2013 through] March 3rd."). Plaintiff did not return to work until April 1, 2013. Pl. Dep. 145. Lamonaca intended to address this incident with Plaintiff upon her return from leave but simply forgot to do so. Lamonaca Mem. On May 6, 2013, Lamonaca was advised of disparaging remarks Plaintiff made about the Hilton hotel in Myrtle Beach. ECF No. 60-4. Those remarks and reports of other allegedly inappropriate behavior with customers, made Lamonaca schedule a meeting with Plaintiff. Lamonaca Mem. Around noon on May 7, 2013, Fife contacted Lamonaca, advising that Plaintiff had been "very rude and belittling" to customers, causing Fife to end the sales tour Plaintiff had been doing. Lamonaca met with Plaintiff on the afternoon of May 7, 2013, discussing the complaints of disparaging remarks, rude behavior, and the February pill incident. *Id.*

In arguing she has demonstrated pretext, Plaintiff does not dispute the incidents of rude behavior detailed by Defendant other than to indicate that she (Plaintiff) had not substantiated the "one incident where a guest was upset and asked to leave." Pl. Mem. 27. Hlavaty and Lamonaca elected to terminate Plaintiff's employment based on her pattern of unprofessional behavior, not solely based on her allegedly haven given medication to a customer. Plaintiff's argument that pretext can be inferred from Defendant's failure to address this specific incident with Plaintiff before May 7, 2013 should not prevail.

Similarly, to the extent Plaintiff argues pretext is shown based on Defendant's failure to follow procedures, *see, e.g.*, Pl. Mem. 27–28, deviation from an employer's procedures could, at most, indicate unfairness, not discriminatory intent. Failure to adhere to common notions of fairness in the termination process is not probative of an intent of improper retaliatory conduct and cannot show pretext. *See, e.g., Vaughan v. Metrahealth Cos., Inc.*, 145 F.3d 197, 203 (4th Cir. 1998) (in ADEA context, noting "'The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent.'" (quoting *Randle*

*v. City of Aurora,* 69 F.3d 441, 454 (10th Cir. 1995) (emphasis in *Randle*)) (abrogation of *Vaughan* on other grounds recognized in *Leake v. Ryan's Family Steakhouse*, 5 F. App'x 228 (4th Cir. 2001)). "Federal courts cannot ensure that business decisions are always informed or even methodical." *Vaughan*, 145 F.3d at 203.

Plaintiff has not established that retaliatory conduct was Defendant's but-for cause for terminating her. *See Nassar*, 133 S. Ct. at 2534. Summary judgment is appropriate.

D.    ADA

Plaintiff avers Defendant wrongly "terminated her based on her disability" in violation of the ADA. Compl. ¶¶ 152–63. To survive summary judgment on a disability-related wrongful discharge claim, Plaintiff must first establish a prima facie case of discrimination by showing: "(1) [s]he was a qualified individual with a disability; (2) [s]he was discharged; (3) [s]he was fulfilling [her] employer's legitimate expectations at the time of discharge; and (4) the circumstances of [her] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (citations omitted) (internal quotation marks omitted). If Plaintiff establishes the prima facie case the familiar *McDonnell Douglas* pretext consideration becomes appropriate. *Labor*, 438 F.3d at 432.[22]

In seeking summary judgment, Defendant first argues Plaintiff cannot establish the first prong of her prima facie case because she has not established she is a "qualified individual with a disability." The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or

---

[22] The undersigned notes that Plaintiff makes a single reference in her Complaint to having "requested reasonable accommodations, and at the time she was terminated by the Defendant." Compl. ¶ 148. In a failure to accommodate case, the plaintiff must show that (1) she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations. *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001). However, Plaintiff has proffered no evidence regarding having requested any accommodation that would permit her to perform essential functions of her job. Plaintiff has not set out a "failure-to-accommodate" ADA claim, and any such attempted claim should not survive summary judgment.

more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). EEOC regulations provide, "[a]n impairment [under the ADA] is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "An impairment is a disability [under the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). However, the impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity" to be "substantially limiting." *Id.* "The term 'substantially limits' shall be construed broadly in favor of expansive coverage" and is "not meant to be a demanding standard." *Id.* § 1630.2(j)(1)(i). Examples of "major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working" and operation of a major bodily function. *Id.* § 1630.2(i)(1).[23]

Defendant also argues Plaintiff cannot establish she is a "qualified individual" under the ADA pursuant to 42 U.S.C. § 12102(1)(C), sometimes known as the "regarded-as" definition of disability. The ADAAA defines the "regarded-as prong" as follows:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter *because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.*

---

[23] The ADA Amendments Act ("ADAAA"), which took effect January 1, 2009, applies to this matter. *See* ADAAA, Pub.L. No. 110–325, 122 Stat. 3553 (2008); 29 U.S.C.A. § 705. The ADAAA substantially broadened the definition of 'disability' under the law in explicit response to the United States Supreme Court's decisions in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and its predecessor, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), in which the ADA's definition of disability was strictly interpreted and created a demanding standard for qualifying as disabled. *See Summers v. Altarum Institute, Corp.*, 740 F.3d 325, 329 (4th Cir. 2014). Under the ADAAA, the "definition of disability shall be construed in favor of broad coverage of individuals"—and, that the term "substantially limits" should be "interpreted consistently with the findings and purposes of the [ADAAA]." 42 U.S.C. § 12102(4)(A)–(B).

42 U.S.C. § 12102(3) (emphasis added). "Thus, the perception of the employer [that the employee has an actual or perceived disability] becomes the relevant inquiry for the court [in considering whether employee is a qualified individual under the ADAAA]." *Chamberlain v. Securian Fin. Grp., Inc.*, 180 F. Supp. 3d 381, 399 (W.D.N.C. 2016).

Both parties cite to the pre-ADAAA standard for establishing a "regarded as" claim, *see* Def. Mem. 30, Pl. Mem. 23–25, which required an employee to show his employer mistakenly believed the employee had an impairment that substantially limited one or more major life activities or mistakenly believed that a nonlimiting impairment substantially limited a major life activity. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999), *overturned by legislative action* (ADAAA, U.S. Pub. L. 110-325 (2009)). Given the Congressional mandate to liberally construe the definition of a "disability," the undersigned focuses on § 12102(a)(C)'s instruction not to consider "whether or not the impairment limits or is perceived to limit a major life activity." Accordingly, at this prima facie stage Plaintiff need not establish the impairment her employer believed to have affected her to any specific degree. *Chamberlain*, 180 F. Supp. 3d at 399. *See Wright v. Stark Truss Co.*, No. CIV.A. 2:10-2427-RMG, 2012 WL 3029638, at *7 n.11 (D.S.C. May 10, 2012) (noting changed standard), *report and recommendation adopted,* No. 2:10-CV-2427-RMG, 2012 WL 3039092 (D.S.C. July 24, 2012). It is not sufficient, though, that an employer is "simply aware of a plaintiff's symptoms; rather the plaintiff must show that the employer regarded the individual as 'impaired' within the meaning of the ADA." *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 435–36 (6th Cir. 2016).[24]

Regarding the "qualified individual with a disability" prong, Defendant argues Plaintiff's deposition testimony and the EEOC Data form she completed when hired demonstrate Plaintiff cannot show she had an impairment during her HGV employment that affected her ability to perform essential

_____

[24] The undersigned is unaware of any published Fourth Circuit cases discussing the proof of a post-ADAAA "regarded as" prima facie case. *See W. v. J.O. Stevenson, Inc.*, 164 F. Supp. 3d 751, 773 (E.D.N.C. 2016) (noting same).

functions of her job, thereby precluding a finding that Plaintiff has a disability as defined under 42

U.S.C. § 12102(2)(A) and (B). Defendant also argues it was unaware of any allegedly disabling

condition. Def. Mem. 26–27. The evidence to which Defendant refers includes the following:

- Plaintiff states the only medical condition or disability that ever limited her ability to perform her job was high blood pressure, but she never provided documentation of high blood pressure and never sought an accommodation based on that condition, Pl. Dep. 176;[25]

- At the time Plaintiff was hired, she knew she had high blood pressure, Pl. Dep. 69, but on the EEOC Data form Plaintiff completed at the time of hiring she Plaintiff indicated she was not a disabled individual. ECF No. 59-8.

In support of its argument that Plaintiff cannot establish the "regarded as" definition, Defendant

argues that Plaintiff testified that no employee of Defendant "ever regarded her as disabled at any point

in her employment." Def. Mem. 30. Defendant provides the following from Plaintiff's deposition:

Q: Okay. And to your knowledge, at no time during your employment did anybody from Hilton believe that you . . . had some sort of disability that would not allow you to perform the essential functions of your job; is that accurate?

A: Yeah. I can work.

Pl. Dep. 279.

In the Complaint and in her response, Plaintiff focuses on the "regarded as" definition of

disability for ADA purposes. 42 U.S.C. § 12102(2)(C). *See* Pl. Mem. 22–28, *id.* at 24 ("Plaintiff was

regarded by the Defendant as having a disability that affected a major life activity as was the high

blood pressure and the need for surgery."); Compl. ¶ 151 (averring discrimination "based on two

separate perceptions that Plaintiff's heart condition [sic] and the fact that she [was] required to have

surgery.") In Plaintiff's Complaint, she avers that "she suffered from a heart condition during her

employment with the Defendants," that "Defendants were aware of her heart condition due to the fact

---

[25] Outside of allegations in Plaintiff's Complaint, the record as presented by the parties includes no *evidence* concerning Plaintiff's claimed high blood pressure or Defendant's knowledge of same. Based on review of one page of Plaintiff's deposition provided for other points, it seems that Plaintiff had asked on one day to leave early because her blood pressure was too high, but was not permitted to do so. Pl. Dep. 176. However, this record contains no further information concerning Plaintiff's blood pressure.

that the Plaintiff was required to take off 4 days for treatment[,]" and that she was "treated for her condition with blood pressure medication." *Id.* ¶¶ 39–41. She submits Defendant "perceived [her] as disabled based on her heart condition." *Id.* ¶ 42.

> Plaintiff also states:
>
> IV. During my employment I was required to have surgery due to medical complications. I would be out of work for the surgery for several days due to the recovery time frame. I was perceived as being disabled by my employer who terminated me 7 days prior to my surgery for pretextual reasons.
>
> VI. That during my employment I was discriminated against based on my national origin, sex, age and disability. That I was treated differently than other employees who were younger, male and not my national origin.
>
> VII. That on May 7, 2013 I made a report regarding discriminatory actions on the part of defendant and its supervisors regarding my national origin, sex, perceived disability and age.
>
> IX. That my employer has discriminated against me on the basis of my age, sex, national origin, disability in violation of Title VII, Americans with Disabilities Act, Age Discrimination in Employment Act, and in retaliation for my previous complaints.

Pl. Mem. 2. Plaintiff notes she discussed her planned breast-reduction surgery with Hlavaty in the context of insurance approvals. Pl. Dep. 155. Plaintiff submits Defendant "was aware of the high blood Pressure and the need for surgery because her direct supervisor made commentary about getting surgery on her titties." Pl. Mem. 26.

The undersigned recommends a finding that Plaintiff has not established a prima facie case under the ADA because she has not demonstrated she is a "qualified individual" as defined in the ADA. Plaintiff does not pursue an argument that she has established a disability pursuant to 42 U.S.C. § 12102(1)(A) or (B), and should be considered to have conceded or abandoned any such argument.

Nor can Plaintiff satisfy the first prong using the "regarded as" analysis under § 12102(1)(C). As noted above, the ADA as amended through the ADAAA no longer requires Plaintiff to show she had, or was perceived by Defendant as having had, an impairment that significantly limited one or more of her life activities. Nonetheless, she still must demonstrate Defendant perceived she had an

impairment. *Neely*, 640 F. App'x at 435–36, *Chamberlain*, 180 F. Supp. 3d at 399. Plaintiff has not done so.

Regarding Plaintiff's alleged high blood pressure/heart condition, the record as presented by the parties includes no *evidence* concerning Plaintiff's claimed high blood pressure or Defendant's knowledge of same. Review of one page of Plaintiff's deposition provided for other points, it seems that Plaintiff had asked on one day to leave early because her blood pressure was too high, but was not permitted to do so. Pl. Dep. 176. However, this record contains no further information concerning Plaintiff's blood pressure. At the summary judgment state, mere unsupported allegations such as those in her Complaint that she had such a condition and Defendant was aware of it because she had taken four days off for treatment are insufficient. While the court views all underlying facts and inferences in the light most favorable to Plaintiff as the nonmoving party, she nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict" in his or her favor. *See Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex,* 477 U.S. at 322–23. The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Similarly, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment Motion. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Regarding Plaintiff's "need for surgery," the record does include evidence that Defendant was aware that Plaintiff planned to have breast-reduction surgery. *See* Hlavaty Dep. 45, Pl. Dep. 155.[26] She has not, however, provided evidence that this surgery was necessitated by a medical impairment. She

---

[26] Plaintiff makes a conclusory reference to a need for carpal tunnel surgery, as well, stating she was "terminated 7 days before her surgery for "carpel (sic) tunnel and breast reduction". Pl. Mem. 9, Pl. Aff. ¶ 16. Plaintiff provides no additional information regarding carpal tunnel surgery. Plaintiff's conclusory statements in her affidavit are insufficient to establish a causal connection between events.

has provided no evidence that Defendant "perceived" an impairment based on the planned surgery. In fact, her former supervisor's comment asking why she would have such surgery because she looked good without it, although certainly insensitive, if anything suggests the "perception" that the surgery was elective. Hlavaty knew Plaintiff planned to have the surgery, and was aware Plaintiff's insurer had requested medical documentation before approving the surgery. Hlavaty Dep. 45. Such knowledge, though, does not suffice to demonstrate Defendant "perceived" Plaintiff to have an impairment.

Because Plaintiff cannot establish the first prong of the prima facie case—that she is a qualified individual with a disability—her ADA wrongful termination claim should be dismissed. Even if assumed for argument's sake that she could satisfy that element, her claim would still fail. Although her termination satisfies the second element, for the reasons discussed above in connection with her Title VII claims, Plaintiff cannot demonstrate she was meeting Defendant's legitimate expectations. *See, e.g.*, *Chauncey v. Life Cycle Eng'g, Inc.*, No. 2:12-cv-968-DCN, 2013 WL 5468237, at *9–10 (D.S.C. Sept. 30, 2013) (granting employer's summary judgment motion as to ADA claim because employee's rude behavior and poor performance at time of discharge showed she was not meeting employer's legitimate expectations).

Even if Plaintiff were considered to have established the first three prongs of her prima facie case, Plaintiff has not provided evidence sufficient to establish the final prong of her ADA wrongful-termination claim—that she was terminated under circumstances giving rise to an inference of discrimination. As discussed more fully above, Defendant has provided evidence from several of Plaintiff's superiors and colleagues concerning her conduct in dealing with customers. Other than the incident with the medication, Plaintiff does not deny those allegations. Nor has Plaintiff presented competent evidence suggesting a causal relationship between her termination and any perception of impairment Defendant alleged possessed. The undersigned is of the opinion that no reasonable juror could infer disability discrimination from this record. Summary judgment is appropriate.

Finally, even assuming, *arguendo*, that Plaintiff could establish a prima facie case of disability discrimination, summary judgment is appropriate because Plaintiff has presented no evidence from which a reasonable juror could determine Defendant's given reasons for her termination were pretextual. *See Palomino v. Concord Hosp. Enters. Co.*, 126 F. Supp. 3d 647, 663 n.6 (D.S.C. 2015) (assuming without decided that plaintiff had established a prima facie case of disability and age discrimination but finding summary judgment appropriate because defendant had established legitimate, nondiscriminatory reason for adverse employment action and plaintiff had not shown pretext).

As discussed above, Defendant has set forth legitimate, nondiscriminatory reasons for Plaintiff's termination—her violation of various policies, specifically including numerous substantiated and unrefuted eyewitness accounts of her behavior with customers. Plaintiff has not established that Defendant's reasons were pretextual and that discrimination was the actual reason she was terminated. Plaintiff's general arguments that Defendant chose to wait until she had "made a complaint regarding discrimination and hostile work environment and she requested FMLA to have surgery," Pl. Mem. 28, fail for the reasons noted above in connection with her Title VII claims. *See Corbell*, 2014 WL 4722194, at *8 (finding no pretext in ADA wrongful termination claim and collecting cases supporting proposition that employer's failure to follow its own procedures in termination not probative of same).

Defendant is entitled to summary judgment on Plaintiff's ADA claim.

E.     Breach of employment contract

In her Complaint, Plaintiff alleges she was "issued certain policies and procedures by [Defendant] as part of her employment with [Defendant,]" and was not required to sign a disclaimer. Compl. ¶¶ 165–67. Claiming these policies and procedures, including the Team Member Handbook, *see* ECF No. 71-7, created a contract of employment between her and Defendant, Plaintiff avers

Defendant breached that contract by failing to follow certain procedures and harassing, retaliating against, and terminating her, Compl. ¶¶ 164–74.[27] ¶

More specifically, in considering Defendant's challenge to Plaintiff's breach of contract claim during the pleadings stage, the court looked to the following allegations concerning that state-law claim:

> When the Plaintiff was hired, she was issued policies and procedures regarding her employment. [Complaint, ECF #1-1, at ¶ 24]. The Plaintiff received training regarding her employment to include Code of Conduct and Paid Time Off. *Id.* at ¶ 25. The Plaintiff received training regarding the Protocols of the Defendants. *Id.* at ¶ 26. The Code of Conduct was issued by Hilton Worldwide and set forth the Policies and Obligations of employees. *Id.* at ¶ 27. The Code of Conduct set forth such things as Statement of Policy, Our Obligations Under Law and Our Policies, Personal Accountability, Respecting and Valuing Diversity, Maintaining a Harassment Free Workplace, Creating a Safe and Healthy Work Environment Unacceptable Behaviors, Advertising and Marketing, Privacy, Conflict of Interest, Fair Dealing, Purchasing Practices, Business Courtesies, Competition and Antitrust, Proprietary, Confidential and Trade Secret Information, Protecting Company Information and Assets, Creating and Maintaining Accurate Business Records. *Id.* at ¶ 28.
>
> The policy set forth "Team members should alert their immediate supervisor, Human Resources, the Assistant General Counsel Governance and Compliance, or the General Counsel about any questions or concerns. Team members also may confidentially report concerns through the Hilton Ethics Hotline at www.hiltonhotline.com or in the United States XXX-XXX-5825." *Id.* at ¶ 29. The policy also set forth "We encourage and value diverse work environment and will achieve success by valuing and leveraging the diversity of our workforce, our guests, our suppliers, and our partners. Respecting the diverse cultures throughout our global organization, as corporate citizens, we will address the local needs of the communities in which we serve, live and work around the world. Therefore, we will not tolerate any discrimination, harassment or retaliation against any individuals or group on the basis of

---

[27] *See* Standards of Conduct, ECF No. 59-4; Team Member Handbook, ECF No. 71-7; HGVC Myrtle Beach Sales Team Handbook, Standard Operating Procedures, ECF No. 61-2. Plaintiff states she did not receive a copy of the Sales Team/Standard Operating Procedures Handbook "to refer to after her employment began." Pl. Mem. 4. To the extent Plaintiff did not receive the Sales Team Handbook, it follows that she could not have relied on anything in that document as creating a contract. *Cf. Moss v. City of Abbeville*, 740 F. Supp. 2d 738, 754–55 (D.S.C. 2010) (finding employee who had not signed, reviewed, or received handbook prior to termination could not prevail on breach of contract claim premised on specific contents of that handbook). "[T]he mere existence of an employee handbook does not mean that there is an employment contract. For a contract to be created, the employee must be aware of promises in the handbook, must have relied on (and continued work in reliance on) those promises, and the promises must restrict the right to discharge." *Lawrence v. Westinghouse Savannah River Co., Inc.,* 2005 WL 3968031, at *14 & n. 83 (D.S.C. March 31, 2005).

ethnic, gender, racial, religious or cultural factors or any other characteristic protected by applicable law." *Id.* at ¶ 30.

The Defendants also set forth a policy against Harassment stating: "Harassment can take many forms including but not limited to: written or verbal abuse or threats, unwelcome remarks, jokes, slurs or taunting of a discriminatory nature, practical jokes that embarrass or insult someone, ignoring isolating or segregating a person, materials that are of discriminatory nature that are displayed publicly, circulated in the workplace, etc. or unwanted physical contact. If any Team Member feels that they are being harassed they should take immediate action by alerting a supervisor or Human Resources. All claims of harassment will be appropriately addressed. Hilton Worldwide will conduct any investigations as confidentially as possible." *Id.* at ¶ 31.

The Plaintiff further received a Hilton Worldwide Hotel Team Member Handbook. The Handbook set forth information regarding the Plaintiff's employment with the Defendants. The Handbook set forth A Welcome Statement, Vision Statement, Mission Statement Values and Key Strategic Priorities, What Worldwide offered and expected, Local and State Harassment Free Workplace Provisions, Local and State Family Medical leave. *Id.* at ¶ 32. The Member Handbook fails to follow the South Carolina Statute regarding disclaimers. *Id.* at ¶ 33.

During the Plaintiff's orientation, the Plaintiff was briefed on the Defendants' protocols and informed that all discipline would follow the disciplinary protocol. The Defendants' discipline protocol stated that each employee would be entitled to a verbal warning, written warning and then termination. *Id.* at ¶ 34.

The Plaintiff was an exemplary employee, regularly performing in the top 15 of 60 employees. *Id.* at ¶ 35. The Plaintiff received no discipline throughout her employment with the Defendants. *Id.* at ¶ 36.

Plaintiff alleges that Defendant violated their policies and procedures by discriminating against the Plaintiff based on her sex, wrongfully terminating the Plaintiff's employment, and subjecting the Plaintiff to a hostile work environment. Plaintiff also alleges the Defendant further violated their policies and procedures by failing to follow the progressive discipline policy. *Id.* at 169.

Sept. 8, 2015 Order 3-5, ECF No. 39.

1. The court's ruling on Defendant's Rule 12(b)(6) motion

In its earlier pleadings-stage Motion, Defendant argued that, as a matter of law, Plaintiff could not establish an employment contract between the parties. *See* Def. Mot. Dismiss 4-10, ECF No. 5. In partially denying that portion of Defendant's Rule 12(b) motion, the court determined Plaintiff had, for Rule 12(b)(6) pleadings purposes, sufficiently set out facts that plausibly could support the existence of a contract because the Handbook and policies she received did not comply with section 41-1-110 of the South Carolina Code requiring a conspicuous disclaimer of contract of employment created by

handbook, personnel manual, or other document issued by employer. *See* S.C. Code Ann. § 41-1-110. Order, ECF No. 39.

The court explained that, under South Carolina law, "for a handbook or policy to form an employment contract, the handbook must set out procedures that are binding on the employer." *Id.* at 7 (citing *Grant v. Mt. Vernon Mills, Inc.*, 634 S.E.2d 15, 20 (S.C. Ct. App. 2006)). The court noted "'mandatory, progressive discipline procedures may constitute enforceable promises.'" Order at 7 (quoting *Hessenthaler v. Tri-Cnty. Sister Help, Inc.*, 616 S.E.2d 694, 698 (S.C. 2005)). "Mandatory, progressive discipline procedures typically provide that an employee may be fired only after certain steps are taken and create an expectation that employment is guaranteed for a specific duration." Order. 8. The court contrasted such mandatory disciplinary procedures with "general policy statements," which "do not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired." *Id.* Determining that whether the progressive disciplinary procedure was mandatory and created an enforceable promise could not be resolved at the Rule 12 stage. *Id.* Accordingly, the court permitted a portion of Plaintiff's breach of contract claim to survive Defendant's Motion to Dismiss.

Importantly here, the court found that only Plaintiff's breach of contract claim "based on the allegation that Defendants failed to follow a progressive disciplinary procedure and terminated Plaintiff in violation of that policy[,]" could proceed. Order 8-9. Whether the progressive disciplinary procedure constituted an enforceable promise was left as a question for another day. *Id.* at 8. On the other hand, the court determined Plaintiff had an available adequate statutory remedy for her claims of discrimination and hostile work environment, and dismissed "Plaintiff's breach of contract claim based on "Defendant's alleged discrimination and creation of a hostile work environment[.]" Order 9-10; *see id.* at 9 (referencing Plaintiff's available statutory remedies under Title VII, the ADA, and the ADEA).

2. Defendant's summary judgment challenge

Defendant seeks judgment as a matter of law as to the breach of contract claim concerning its progressive disciplinary procedures, arguing that, on consideration of the record, including the text and disclaiming language of the relevant documents, the progressive disciplinary procedures are not mandatory or binding. Alternatively, Defendant argues that, if a contract exists, it was not breached. Def. Mem. 34-37.

Defendant submits the Standards of Conduct policy, Team Member Handbook, and Myrtle Beach Sales Team Handbook unambiguously state that Plaintiff was employed on an at-will basis. Standards of Conduct Policy 8.5, ECF No. 59-4 at 2 (listing various standards, but noting company retains discretion to "terminate the employment relationship at-will," and reserving right to "determine what type of disciplinary action may result from any violation of the standards of conduct"); HGVC Myrtle Beach Sales Team Handbook, Standard Oper[a]ting Procedures, ECF No. 61-2 at 10 ("The company maintains an at-will employer/employee relationship; however individuals who do not adhere to the Sales attendance guidelines are subject to the following progressive discipline: . . . ."). In deposition, Plaintiff acknowledged that her employment was at-will, and she could quit at any time and be terminated at any time. Pl. Dep. 82-83. Plaintiff was also aware Defendant could skip steps in the disciplinary process, and she could be terminated for a single violation of a policy, such as mistreating a customer. *Id.* at 89, 92-94. Plaintiff also acknowledged she could have been terminated as a result of initialing a sales document on behalf of a customer in April 2012 even though she had received no prior discipline. *Id.* at 117-19. Accordingly, Defendant submits its Handbook and policies did not include a progressive discipline policy that uses the specific, mandatory language required to be binding on it. Def. Mem. 34-35 (citing, *e.g., Grant*, 634 S.E.2d at 22).

In response, Plaintiff argues the breach of contract claim should survive summary judgment so that a jury may consider whether a contract exists. Pl. Mem. 32-34. Plaintiff again argues the disclaimers in Defendant's Handbook and policies do not satisfy South Carolina's statutory

requirements to permit such disclaimers foreclose a contract's existence. Defendant has conceded this point and it need not be further considered here.

In setting out the facts in her memorandum, Plaintiff briefly cites to Hlavaty's testimony that a progressive discipline policy exists. Pl. Mem. 4 (citing Hlavaty Dep. 24, ECF No. 71-11). Hlavaty stated Defendant follows a "progressive approach to discipline with verbal warning, written warning, final written warning and termination. However, the company has the right to look at each case and determine the severity and could jump steps if necessary." Hlavaty Dep. 25.

However, Plaintiff in opposing summary judgment, does not present evidence or argument as to any progressive discipline policy in the Handbook or policies at issue here. Pl. Mem. 33-34. Further, Plaintiff does not refer the court directly to the progressive discipline policy her Complaint avers was breached. Plaintiff does not attempt to defeat summary judgment as to the claim a progressive discipline policy was breached. Plaintiff ends this portion of her argument as follows:

> The Defendant is not entitled to summary judgment as to the Breach of Contract claim based on the employee handbook. Pursuant to the Defendant's handbook *the Plaintiff was entitled to a harassment free workplace, a workplace free of discrimination*. The Defendant failed and refused to provide those to her. There is a genuine issue of material fact for the jury to consider.

Pl. Mem. 34 (emphasis added). As correctly noted by Defendant on reply, Plaintiff does not seek to defeat summary judgment as to the only potentially viable portion of the breach-of-contract cause of action: a claim based on the progressive discipline process. Def. Reply 12, *see* Order 8-9. Plaintiff does not reference the progressive discipline policy, nor does she provide support to her claim that Defendant breached such policy.

Plaintiff has abandoned this argument and it need not be considered further. *See Evans v. Banks Const. Co.*, No. 2:11-CV-2526-CWH, 2013 WL 5437639, at *6 (D.S.C. Sept. 27, 2013) (finding summary judgment appropriate when plaintiff did not respond to specific claims in opposing summary judgment). Here, Plaintiff does not pursue her breach of contract claim on the only ground that

survived Defendant's Rule 12 motion. This cause of action has been abandoned and should be dismissed.

### III.     Remaining causes of action and parties

Other corporate defendants were dismissed by prior Order. *See* ECF No. 89. Defendant Mark Lamonaca remains a named defendant. *See* Compl. ¶ 8, However, it does not appear that Lamonaca has been served with process.

The Complaint also references "Kevin Kaylor," *see, e.g.*, Compl. ¶¶ 191-97, (also referenced in the record as Kevin Kahler). Kaylor/Kahler is not listed as a defendant, and it does not appear that he has been served. The only causes of action in the Complaint that purport to have been brought against Lamonaca and Kaylor/Kahler are those for violation of privacy rights and intentional infliction of emotional distress. *See* Compl. ¶¶ 185-97. Plaintiff is not pursuing the privacy claim. *See* Pl. Mem. 34. As Lamonaca and Kaylor/Kahler have not been served, it is recommended any claims brought against them be dismissed with prejudice for failure to prosecute. Fed. R. Civ. P. 41.

### IV.     Conclusion and Recommendation

For the reasons set forth above, the undersigned recommends Defendant's Motion for Summary Judgment, ECF No. 59, be *granted*. In addition, all other claims Plaintiff raised against Mark Lamonaca and Kevin Kahler should be dismissed with prejudice pursuant to Rule 41. If this Report is adopted, this matter will be ended as to all claims and parties.

IT IS SO RECOMMENDED.

January 23, 2017                    Kaymani D. West
Florence, South Carolina         United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina 29503

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).